Helen Jane AVERY, Plaintiff,

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, Defendant.**

Civ. A. No. 1863–70.

United States District Court,
District of Columbia.

June 17, 1971.

Chester C. Shore, Washington, D. C., for plaintiff.

James V. Dolan, Washington, D. C., for defendant.

MEMORANDUM–ORDER

GASCH, District Judge.

This is an action for damages for alleged violation of the Securities and Exchange Act of 1934 and the Federal Reserve Board regulations, and rescission of the sale of stock and a return of money on deposit. This matter came on for consideration on the plaintiff's motion for summary judgment.

On May 26, 1970, the defendant, acting as broker for the plaintiff, sold short for the plaintiff 500 shares of Teleprompter stock. At the time of the sale the plaintiff had $14,024.57 on deposit in her account with the defendant. The proceeds from the short sale were $22,999.23. The parties agree that a short sale is a margin transaction and as such subject to Section 7 of the Securities and Exchange Act of 1934,[1] and Regulation T of the Federal Reserve Board.[2] At the time of the sale the

---

1. 15 U.S.C. § 78g.

2. 12 C.F.R. § 220.

margin requirement of the Federal Reserve Board was 65 percent, which in this case amounted to $14,949.69 or $925.12 more than the plaintiff had in her account. Under the Regulation, the margin requirement must be met before the end of the fifth full trading day after the transaction.[3] Here, however, the margin requirements were not met within the requisite time. The defendant on June 8th or 9th liquidated the plaintiff's short position for a total price of $31,385.38 which resulted in a loss of $8,382.51 which was deducted from the plaintiff's account, reducing that account from $14,024.57 to $5,642.06.

Plaintiff contends that the defendant violated the margin requirements of 15 U.S.C. § 78g and Regulation T; and the signature requirement of 15 U.S.C. § 78g implemented by 17 C.F.R. 240.17a–3, and therefore, pursuant to Section 29[4] of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78cc(b), contends that the short sale should be declared null and void and rescinded.

The defendant contends that there were no violations of the regulations at the time of the initial sale, and to the extent they may have later been violated, any violation was solely attributable to the plaintiff who refused to comply with the margin and signature requirements despite alleged repeated requests by the defendant. The defendant further contends, however, that if there were technical violations, they relate only to the 40 shares which needed to be liquidated to meet the margin requirements.

The Court is disturbed by the entire transaction. It appears that a knowledgeable customer experienced in the requirements and functions of the Exchange authorized a short sale of a considerable quantity of stock by one of the world's largest stockbrokers and then later repudiated the sale when she saw it was going poorly. It seems that both the plaintiff and the defendant were aware that the margin requirements were not met within the requisite five days. The defendant alleges that the plaintiff promised to supply the money to meet the margin requirements and also to sign the signature card and that because of these representations the defendant did not meet the requirements by liquidating.

■ An analysis of the background of the 1934 Act would be helpful. The Act was passed in reaction to the stock market "crash" of 1929, and in order to prevent a similar occurrence in the future. The primary concern of the Congress was to prevent excessive speculative credit transactions and with this objective in view provided for the margin requirements.

The main purpose of these margin provisions * * * is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of law. Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly—although such a result may be achieved as a by-product of the main purpose.

The main purpose is to give a government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation in the stock market and out of other more desirable uses of commerce

---

3. 12 C.F.R. § 220.3(b).

4. 15 U.S.C. § 78cc provides in part:

(b) Every contract made in violation of any provision of this chapter or any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule or regulation, shall have made or engaged in the performance of any such contract.

and industry—to prevent a recurrence of the pre-crash situation where funds which would otherwise be available at normal interest rates for uses of local commerce, industry and agriculture were drained by far higher rates into security loans and the New York call market.[5]

In addition, another less important purpose of the legislation was to protect the margin purchaser or innocent individual investor.[6]

The recent cases have been uniform in recognizing civil liability for violation of the margin requirements of Regulation T.[7] These cases hold that the transaction is voidable at the option of the innocent party.[8] The defendant in opposing the present motion relies strongly upon a group of cases which allegedly stand for the proposition that the plaintiff's instigation or wilful participation in the violation would preclude her recovery by rescission.[9] Defendant contends that the plaintiff is not entitled to judgment if she were *in pari delicto*. The plaintiff seeks in her opposition to distinguish these cases contending that the *Moscarelli* case involved fraudulent conspiracy, not alleged or alluded to in the instant case; that the *Aubin* case involved a contested issue of fact, not here present;[10] and that the *Serzysko* case involved knowing deception, again, not alleged here. Plaintiff cites *Serzysko* as the authority for the proposition that mere participation in a violation of

the Regulation without anything further does not bar the plaintiff from relief.[11]

The logic behind the *Moscarelli* case and the others denying recovery is that "Congress did not intend to protect investors at all times and under all circumstances regardless of their conduct."[12] The protection of investors is only a secondary or ancillary purpose of the Act with the primary consideration being prevention of excessive speculation on credit. These decisions seem to say that "to permit a broker's customer, who conspires or aids and abets the broker in violation of the provisions of Section 7(c), to recover his losses from his broker, would defeat the very purpose of the section and the economic considerations which underlie its enactment."[13] This proposition is advanced by Judge Friendly, dissenting in the case of Pearlstein v. Scudder & German.

\* \* \* I doubt whether permitting the customer to shift the risk of market decline to the broker is generally either necessary or desirable as a means of furthering the primary purpose of § 7(c). Occasional and isolated violations of Regulation T do not threaten to cause a significant alteration in the allocation of credit in the economy; only widespread or repeated violations would pose a danger. But it is in just such situations that we may confidently expect application of the administrative and criminal sanctions provided by the Act. The eco-

5. H.R.Rep.No.1383, 73d Cong., 2d Sess. 8 (1934).

6. See 78 Cong.Rec. 7700 (1934).

7. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (S.D.N.Y.1968), cert. denied 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969); Smith v. Bear, 237 F.2d 79 (2d Cir. 1956); Junger v. Hertz, Neumark & Warner, 426 F.2d 805 (2d Cir. 1970); Appel v. Levine, 85 F.Supp. 240 (S.D.N.Y.1948); Remar v. Clayton Securities Corp., 81 F.Supp. 1014 (D.Mass. 1949). See Note, Federal Margin Requirements as a Basis for Civil Liability, 66 Colum.L.Rev. 1462 (1966).

8. J. Cliff Rahel and Co. v. Roper, 186 Neb. 34, 180 N.W.2d 682 (1970).

9. Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (S.D.N.Y.1968), aff'd 409 F.2d 1360; Aubin v. H. Hentz & Co., 303 F.Supp. 1119 (S.D.Fla.1969); Moscarelli v. Stamm, 288 F.Supp. 453 (E.D. N.Y.1968).

10. *Cf.* Statement of Material Facts as to Which Plaintiff Contends There is no Genuine Issue.

11. 290 F.Supp. at 88.

12. 288 F.Supp. at 459.

13. *Id.*

nomic purpose behind § 7(c) thus causes the provision to differ from those portions of the securities acts more directly aimed at the protection of investors.[14]

\* \* \* \* \* \*

Any deterrent effect of threatened liability on the broker may well be more than offset by the inducement to violations inherent in the prospect of a free ride for the customer who, under the majority's view, is placed in the enviable position of 'heads-I-win tails-you-lose.' [15]

■ This Court, however, concludes that the reasoning of the *Moscarelli* case and similar cases does not and should not be applied to this situation where there is no allegation of fraud, deceit, conspiracy, or dispute of fact. The Court finds that it was the clear intent of Congress to regulate excessive speculation on credit and that the means the Congress chose were the margin requirements which clearly place the onus of meeting certain minimum margin percentages on the brokers and dealers and not on their customers.[16] This Court does not intend to change this explicitly expressed legislative judgment by judicial fiat thereby imposing common law negligence and causation standards upon the regulations. The Court concludes that mere participation in or knowledge of a violation without fraud or deceit is not enough to deny the plaintiff recovery.[17] The Court agrees with the majority in the *Pearlstein* case:

In our view the danger of permitting a windfall to an unscrupulous investor is outweighed by the salutary policing effect which the threat of private suits for compensatory damages can have upon brokers and dealers above and beyond the threats of governmental action by the Securities and Exchange Commission.[18]

■ To allow the broker to plead contributory negligence or causation by the customer as the reason for a violation would remove the very heart of the legislation, for in every case of a violation the dealer could be heard to assert participation. The duty of the broker is made completely clear by the Regulation —if the investor has not made sufficient deposit to meet the margin requirements within the five-day period, the broker is required to liquidate in order to cover the position.

In any case in which the deposit required by paragraph (b) of this section, or any portion thereof, is not obtained by the creditor within the 5-day period specified therein, margin non-exempted securities shall be sold (or, to the extent that there are insufficient margin non-exempted securities in the general account, special bond account, or special convertible security account other liquidating transactions shall be effected in such account), prior to the expiration of such 5-day period, in such amount that the resulting decrease in the adjusted debit balance of such account exceeds, by an amount at least as great as such required deposit or the undeposited portion thereof, the 'retention requirement' of any margin or exempted securities sold: *Provided,* That a creditor is not required to sell securities or to effect other liquidating transactions specified by this paragraph in

14. Pearlstein v. Scudder & German, 429 F.2d 1136, 1147–1148 (2d Cir. 1970).

15. *Id.* at 1148.

16. 429 F.2d at 1141.

17. Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). See also Note, Stockbrokers Violation of Federal Reserve Board's Regulation T Creates an Implied Cause of Action in the Customer That is not Defeated by Either the Customer's Knowledge of the Violation or Subsequent Settlement of the Debt Owed the Broker, 49 Texas L. Rev. 192, 194, 195 (1970).

18. 429 F.2d at 1141.

an amount greater than necessary to eliminate the excess of the adjusted debit balance of such account over the maximum loan value of securities remaining in such account after such liquidation.[19]

Here, had the defendant Merrill, Lynch liquidated plaintiff's position within the five days as required, they would be held blameless, but by failing to do so, they subjected themselves to liability.

The Court will not entertain a cacophony of blame on the part of the brokers and customers—each blaming the other for not meeting the requirements—the ultimate responsibility must be placed somewhere and Congress has indicated that it is with the brokers or dealers. The Court concludes that civil liability is a helpful and beneficial adjunct to criminal and administrative sanctions in implementing the purpose of the Act, namely, deterring excessive credit transactions. It appears that in the instant case it may well be true that the plaintiff was not an "innocent 'lamb' attracted to speculation by the possibility of large profits with low capital investment," [20] but rather was aware of the margin requirements and nevertheless disregarded them. The Court deplores this type of alleged investor behavior and were not the mandate of Congress so unequivocal and the public policy considerations so strong, the Court might reach a substantially different decision than the one it does. The participation, however, by plaintiff is not enough to relieve the defendant of its squarely imposed statutory duty, and hence the Court concludes that the plaintiff's motion for summary judgment should be granted. The Court does not find it necessary for this decision to rule on the question of whether the failure to obtain the completed signature card would of itself be sufficient to make this transaction voidable, but it is the impression of the Court under the circumstances of this case that the violation, if any, was insufficient to make the transaction voidable.

Ordered that the plaintiff's motion for summary judgment be and the same hereby is granted.

19. 12 C.F.R. § 220.3(e).

20. 429 F.2d at 1148.